J-A29032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.G.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1019 WDA 2025 |

Appeal from the Order Entered July 14, 2025
In the Court of Common Pleas of Fayette County
Orphans' Court at No. 53 ADOPT 2024

BEFORE: OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:       **FILED: November 26, 2025**

G.R. (Paternal Aunt) appeals from the order which denied her petition to involuntarily terminate the parental rights of her nephew, J.B. (Father), to her great-niece, A.G.H. (Child). As the record is deficient, we vacate the order and remand the case to the orphans' court.

*Factual and Procedural History*

Child was born in March 2015 to R.H. (Mother). In March 2022, Mother and L.T. (Father's Mother) both died after overdosing on drugs provided by Father. As a result of the deaths, Father faced criminal charges and pled guilty to two counts of involuntary manslaughter. On December 17, 2024, Father was sentenced to serve an aggregate two to four years of incarceration.

Father's Mother and Paternal Aunt were sisters. The orphans' court explained:

> [Child] has been in [Paternal Aunt's] physical custody … continuously since August of 2022. [Paternal Aunt] obtained an Emergency Order granting her physical custody of [C]hild from the Court of Common Pleas of Centre County, Pennsylvania, on September 16, 2022. At a hearing held on September 28, 2022, Father consented to an Order granting [Paternal] Aunt primary physical custody of [Child]. Father consented to the Order because he was aware that he would soon be incarcerated and wished to leave [C]hild in the custody of family rather than foster care. Father has been continuously incarcerated since December of 2022. Father is currently serving sentences for DUI and Involuntary Manslaughter for causing the death of Mother. Father expects to be paroled in approximately [September] of 2025. [Child] resided with Father from her birth until April of 2022. In the years during which [C]hild resided with Father, he performed numerous parental duties, including but not limited to bathing, changing diapers, cooking, reading to [C]hild and putting her to bed. Father would help with homework and [was] involve[d] in her school activities.

Orphans' Court Opinion (OCO), 8/21/25, at 2-3 (citations to notes of testimony omitted).

On July 26, 2024, Paternal Aunt filed a petition to terminate Father's parental rights. The orphans' court held a two-day hearing on January 21, 2025, and March 17, 2025.[1] Paternal Aunt presented testimony from Dr. Braelyn Tracy, who was qualified as an expert in child psychology. N.T. at 4-9. Dr. Tracy testified that she began counseling Child in September 2022, because Child was having "emotional and behavioral challenges." *Id.* at 9-10. Dr. Tracy stated:

_____

[1] As the notes of testimony from both days are numbered sequentially and without interruption, we refer to them collectively as "N.T."

I could definitely tell that she was a trauma profile. She definitely displayed some adjustment challenges that she had given the living situation, and she had a lot of disconnect [with F]ather.

***

[D]uring the intake visit, I was just kind of building a rapport but throughout the first initial sessions … I gave her[,] as well as [Paternal Aunt,] a couple of self-report assessments to complete to help get a diagnosis.

*Id.* at 10-11.

Dr. Tracy diagnosed Child with post-traumatic stress disorder with "adverse childhood experience, as well as generalized anxiety disorder." *Id.* at 11. Child has participated in biweekly therapy with Dr. Tracy since 2022. *Id.* According to Dr. Tracy, Child has "progressed significantly." *Id.* at 21. She described Child as "feeling safe and secure in her environment" with Paternal Aunt, and "excelling in school and socially." *Id.*

Dr. Tracy conducted a bonding assessment between Child and Paternal Aunt. *Id.* at 17-18. She stated:

[Child] and [Paternal Aunt] have a great bond. Even from the initial intake I could see that [Child] felt secure and safe with [Paternal Aunt]. She was very open in sharing anything going on or any concerns that she had. She was also able to communicate easily with [Paternal Aunt] regarding some of [what] she experienced and how she wanted to move forward.

*Id.* at 18. As to Father, Dr. Tracy concluded from speaking with Child that "there was clearly no bond," but conceded that she had not had any contact with Father or observed him with Child. *Id.* at 18-19, 23. Dr. Tracy opined that termination of Father's parental rights was in Child's best interest. *Id.* at 20.

Paternal Aunt testified that she was 70 years old and had been an ICU nurse prior to her retirement. *Id.* at 43, 59. She explained that her household consisted of Child, who was 10 years old at the time of the hearing, and Paternal Aunt's 11-year-old daughter, (B.R.), who she had fostered through Children and Youth Services (CYS) and adopted. *Id.*

Paternal Grandmother explained that she and Child knew each other prior to April 2022, and that Father and Mother "stayed at [her] house" when they traveled from Centre County to see family in Fayette County. *Id.* at 64. Likewise, Paternal Aunt would see Child when she visited her sister, Father's Mother, in Centre County, because Father's Mother "lived there [and Child] would come over to visit because that was her grandma." *Id.* Paternal Aunt said that Child knew her as "Aunt G[.]" *Id.*

Paternal Aunt testified that she began caring for Child in April 2022, when "CYS called and asked me to come and pick [Child] up." *Id.* at 44. She confirmed that Father consented to her sole legal and physical custody of Child. *Id.* at 48-49. Paternal Aunt introduced Child's birth certificate into evidence, and noted that Father was not identified as Child's father. *Id.* at 51-52.

Paternal Aunt relayed that Child has thrived in her care for the past three years. She described Child as "very happy." *Id.* at 57. She stated that Child "loves [B.R.] and calls her her sister." *Id.* Regarding Father, Paternal Aunt testified that he initially had regular telephone contact with Child, but the phone calls became less frequent with time. *Id.* at 61. Paternal Aunt

- 4 -

stated that Father's most recent phone call to Child occurred in August 2023. *Id.* She explained that Father stopped sending letters to Child after August 2023, although "a few months ago he [sent] a letter and we'd get one every now and then." *Id.* at 61, 65. Paternal Aunt stated that Child wrote Father letters "initially, but she doesn't now." *Id.* at 66.

Paternal Aunt testified that she has had "no communication" with Father since 2023. *Id.* at 65-67. She stated that their relationship "wasn't the best, but as time went on it was worse, and he was fighting with me on the phone every time he'd call." *Id.* at 67. In August 2023, Paternal Aunt told Father "that if he continued to threaten [her] that [she] would no longer be in touch with him." *Id.* at 67-68. Paternal Aunt expressed concern that when Father "gets out of jail the first thing he's going to do is drive to my house" and "take [Child]." *Id.* at 71, 74.

Father testified by video from the State Correctional Institution (SCI) at Camp Hill.[2] He explained that in addition to his 2-4 year sentence for involuntary manslaughter, he was serving sentences for four convictions of driving under the influence (DUI).[3] *Id.* at 78-79.

Father testified that he assumed the role of Child's father from the time she was born. *Id.* at 81. He noted his involvement with CYS, and stated that

---

[2] Father appeared remotely from SCI Camp Hill throughout the proceedings. *Id.* at 3, 33, 41, 78.

[3] Father did not identify the length of the sentences, but stated, "my DUI's, two of them are concurrent, the second and third[, and t]he fourth one was run consecutive." *Id.* at 79.

CYS "acknowledged me as [Child's] father." *Id.* at 80. He explained that he was not identified on Child's birth certificate because he and Mother "were going through a tough time and [Mother] had met someone else, and there was a toss-up." *Id.* According to Father, Mother "cheated on [him in] June of 2014." *Id.* at 104. Father testified that he was at the hospital when Child was born, and lived with Mother and Child until Mother's death. *Id.* at 85. At that time, Father and Mother had been together for nine years and were engaged. *Id.* at 81, 83. Father said that he, Mother, and Child "always did things" together. *Id.* at 81. Father testified:

> I gave [Child] baths; I cooked for her; I read her books at night. When she came home from school, I would do homework with her. She could read at a very high rate. I read to her while she was in [Mother's] belly because I researched on the Internet and found out that they can hear your voice and everything like that. I took her to the store shopping with me. She loves spaghetti, so we cooked spaghetti at least once a week. Just anything that she needed. Taking her to the park. We took her to … a place called DelGrosso's and we would … go swimming.

*Id.* at 85-86.

Father confirmed that he and Mother used drugs and that he was responsible for Mother's death from an overdose in March 2022. *Id.* at 82-83. He stated that he was 41 years old and had abused drugs "off and on since the age of 21." *Id.*

Father also confirmed that Paternal Aunt was his mother's sister. He stated that he and Paternal Aunt had a "close relationship" when he was younger, but "drifted apart" as he got older. *Id.* at 87. Father testified to his

belief that Paternal Aunt takes good care of Child. *Id.* Father said, "I believe that she has raised her [older] two kids well, so I'm basing [my] knowledge off of that. I haven't had any contact with [Child] since August 19, 2023, [but what] could there possibly be [different] in that time frame?" *Id.*

Father testified that in April 2022, when Paternal Aunt initially began caring for Child:

> It was good. We would talk every day on the phone. She would tell me how [Child] was doing. I would talk to her daily. I even drove down there one time and I stayed at her house and [saw Child] and her adopted daughter, [B.R.]….
>
> I visited her in April and then even when she took custody, the final order, … in September [2022], I would drive in. I think I drove in two times in September, but it was only once in October, and then … not at all in November. And I would stay at her house every time that I would drive in to see [Child].

*Id.* at 90.

Father testified that his relationship with Paternal Aunt deteriorated after he was incarcerated. *Id.* at 91. He described Paternal Aunt telling him that he "only needed to call once a month because [Child] was taking it too hard." *Id.* He also referenced a disagreement with Paternal Aunt in August 2023, which resulted in Paternal Aunt blocking his calls. *Id.* at 92-93. Father testified that he attempted to reach Child by calling Paternal Aunt "at least 60" times, but has not spoken with Child since August 2023. *Id.* at 105, 109. He stated that he continued to send letters to Child. *Id.* at 94. He estimated that he had sent Child "approximately 30" letters. *Id.* at 106. He stated that Child received at least one of the letters because she wrote back and answered

some of the questions he had asked in a letter he had sent in July or August 2024.  ***Id.*** at 95-96, 99-100.  Father introduced the letter, stamped with a postal date of October 11, 2024, as Exhibit 1.  ***Id.*** at 98.

Finally, Father testified that he had never told Paternal Aunt that he would take Child from her.  ***Id.*** at 101.  Father confirmed that he would like to see Child "on the day" he is released from prison.  ***Id.*** at 102.  However, he explained:

> I want a relationship with my daughter.  I want to be able to see her and do things with her.  It's going to take me time getting out of jail, getting a job, finding a place to live, getting back on track.  That is going to take one or two years alone.

***Id.***  Father also testified to completing court-ordered drug and alcohol programs during his incarceration "to learn how to beat this addiction that … put me in jail."  ***Id.*** at 102-03.

At the conclusion of the hearing, Paternal Aunt's counsel asked, "in lieu of summation," that the parties "submit findings of fact and conclusions of law to the [c]ourt."  ***Id.*** at 116.  Paternal Aunt's counsel added that he would order the notes of testimony from the hearing.  ***Id.***  Father's counsel and Child's counsel did not object,[4] and the orphans' court advised, "we'll do 30 days from receipt of our transcript" for Paternal Aunt's filing, and "20 days after that for [Father's counsel], and 20 [days] after that for [Child's counsel]."  ***Id.*** at 117.  That same day, the court entered an order which directed that

---

[4] Child's counsel stated her agreement with "[w]hatever timeline the [c]ourt imposes."  ***Id.*** at 117.

- 8 -

Paternal Aunt "shall file proposed findings of fact, conclusions of law, and a suggested order within thirty (30) days from receipt of the transcript." Order, 3/17/25. The order reiterated:

> Father shall have a period of twenty (20) days to file proposed findings of fact, conclusions of law, and a suggested order within twenty (20) days from the receipt of [Paternal Aunt's] proposed findings of fact, conclusions of law, and suggested order; and
>
> [c]ourt-appointed counsel for [C]hild shall have a period of twenty (20) days from receipt of [Father's] proposed findings of fact, conclusions of law, and suggested order to submit her written recommendations to the [c]ourt with a proposed suggested order.

*Id.*

On June 23, 2025, Paternal Aunt filed proposed findings of fact and conclusions of law. The certified record does not contain corresponding pleadings from Father or Child's counsel. However, the trial docket shows an "ADMISC" filing on July 7, 2025, and Paternal Aunt, in her Reproduced Record, has included a copy of Father's proposed findings of facts and conclusions of which are stamped by the Register of Wills as filed on July 7, 2025.[5] *See* R.R. at 119-26. In her brief, Paternal Aunt states that "[b]oth parties timely submitted said proposed findings of fact and conclusions of law to the [orphans'] court."[6] Paternal Aunt's Brief at 11. The orphans' court subsequently entered the order stating:

---

[5] The Reproduced Record does not include any pleadings or recommendations from Child's counsel.

[6] Paternal Aunt does not refer to any filing or recommendation from Child's counsel. *See* Paternal Aunt's Brief at 5-41.

- 9 -

AND NOW, this 14th day of July, 2025, after hearing and upon the recommendation of … appointed counsel for [Child], the [c]ourt hereby adopts the findings of fact and conclusions of law submitted on behalf of [Father]. Based thereon, the Petition for Involuntary Termination of Parental Rights is DENIED.

Order, 7/14/25.

On August 12, 2025, Paternal Aunt filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court issued an opinion pursuant to Rule 1925(a), in which it repeated that its decision was based on "two (2) days of testimony and after the recommendation of the G.A.L." OCO at 4. The court did not otherwise address or discuss the recommendation of Child's counsel. *See id.* at 4-8.

On appeal, Paternal Aunt presents the following questions:

1. Did the [orphans'] court err in both law and fact in factually concluding that [Father] was the natural father of [C]hild?

2. Did the [orphans'] court err as a matter of law in finding that [Father] did not fail to perform his parental duties by conduct continuing for at least six months immediately preceding the filing of the petition, and thus his parental rights should not be terminated?

3. Did the [orphans'] court err as a matter of law and fact in failing to find that [C]hild was removed from the parents by a court of competent jurisdiction, at least 12 months have elapsed from the date of the removal or placement, the conditions which led to the removal or placement continue to exist, and the termination of parental rights would best serve the needs and welfare of [C]hild?

4. Did the [orphans'] court err as a matter of fact and law in failing to find that the developmental, physical, and emotional needs and welfare of [C]hild supported the basis for the termination of [Father's] rights based upon the clear and convincing evidence submitted by [Paternal Aunt]?

- 10 -

Paternal Aunt's Brief at 4.

Father maintains that the orphans' court did not err in declining to terminate his rights because he "utilized all of the resources in his command to maintain a close parental relationship with Child." Father's Brief at 5. Child's counsel has not filed a brief, but has advised that as "counsel appointed to [Child], I will not be filing a brief to the Superior Court and will rely and defer to the opinion and orders of the [orphans' court]…." Letter, 11/3/25.

*Discussion*

Our standard of review in termination of parental rights cases requires this Court to accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record. ***Int. of H.H.N.***, 296 A.3d 1258, 1263 (Pa. Super. 2023). If the factual findings are supported, appellate courts review an order to determine if the court made an error of law or abused its discretion. ***Id.*** This Court's standard and scope of review of questions of law is *de novo* and plenary. ***Int. of D.G.,*** 241 A.3d 1230, 1236 (Pa. Super. 2020) (citation omitted). Here, our review reveals an error of law which prevents meaningful review.

As indicated above, the record contains gaps regarding the role of Child's counsel and her advocacy. It is unclear whether Child's counsel served as Child's guardian *ad litem* and/or Child's legal counsel, and the orphans' court did not make "the requisite determination" that Child's legal and best interests did not conflict. ***See Int. of A.J.R.O.***, 270 A.3d 563, 570 (Pa. Super. 2022). The Rules of Juvenile Court Procedure explain:

"Legal interests" denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. "Best interests" denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees.

Pa.R.Juv.P. 1154.

A child has a right to legal counsel in termination proceedings. Section 2313(a) of the Adoption Act states:

**(a) Child.—**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

Our Supreme Court has held that "appellate courts should engage in limited *sua sponte* review of whether children have been afforded their statutory right to legal counsel when facing the potential termination of their parents' parental rights." **In re Adoption K.M.G.**, 240 A.3d 1218, 1238 (Pa. 2020). This Court has explained:

Section 2313(a) requires the [orphans'] court to "appoint an attorney to represent the child's legal interests, *i.e.*, the child's preferred outcome." **In re T.S.**, … 192 A.3d 1080, 1082 ([Pa.] 2018). The failure to appoint legal counsel constitutes a structural error which is not subject to a harmless-error analysis. **Id.** "[T]he recognized purpose of the statute is to ensure that the needs and welfare of the children involved are actively advanced." **In re Adoption of L.B.M.**, … 161 A.3d 172, 180 ([Pa.] 2017).

- 12 -

> It is well-settled that "an attorney appointed as counsel to represent a child's legal interest may also serve as the child's [guardian *ad litem*], responsible for asserting the child's best interests, **so long as the child's legal interests do not conflict with the attorney's view of the child's best interests**." *K.M.G.*, 240 A.3d at 1224.

*In re Adoption of K.E.G.*, 288 A.3d 539, 541 (Pa. Super. 2023) (emphasis added). The failure to appoint counsel to represent a child's legal interests "is a non-waivable error." *T.S.*, 192 A.3d at 1087.

It appears that the orphans' court appointed Child's counsel to serve as Child's guardian *ad litem*. At the hearing, the orphans' court stated only that it "appointed [counsel] to represent the interest of the minor child."[7] N.T. at 3. However, the court later stated that its decision was based on "the recommendation of the G.A.L."[8] OCO at 4. Regardless, the record contains no indication that the orphans' court determined whether there was a conflict between Child's legal and best interests. Accordingly, we vacate the order and remand for the orphans' court to fulfill its Section 2313(a) duty, as articulated in *K.M.G.*, and determine whether Child's counsel could represent both the legal and best interests of Child without conflict. If there is a conflict, the orphans' court shall appoint separate counsel and conduct a new termination hearing. If the orphans' court determines there is no conflict, the court and the parties shall ensure that the certified record is supplemented

---

[7] There is no order appointing Child's counsel in the record.

[8] As noted above, Counsel has identified herself to this Court as "counsel appointed to" Child. Letter, 11/3/25.

with all missing pleadings, including the order appointing Child's counsel, and the pleadings relied upon by the orphans' court, *i.e.*, Father's proposed findings of fact and conclusions of law, and Child's counsel's recommendation regarding termination.[9] ***See Eichman v. McKeon***, 824 A.2d 305, 316 (Pa. Super. 2003) (stating "[a]ny document which is not part of the official certified record is considered to be non-existent"); ***Costello v. Costello***, 666 A.2d 1096, 1098 (Pa. Super. 1995) (finding remand appropriate where the record is incomplete).

For the above reasons, we vacate the order entered on July 14, 2025, remand with instructions and for further proceedings consistent with this decision, and strike the case from oral argument scheduled for December 10, 2025.

Order vacated.    Case stricken from argument and remanded. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/26/2025

---

[9] During the hearing, Child's counsel questioned witnesses (and objected repeatedly during Paternal Aunt's testimony), but did not indicate that she had communicated with Child and did not express an opinion about termination. ***See, e.g.***, N.T. at 44-45, 47-48, 53, 56, 58, 60-62.